UNITED STATES BANKRUPTCY COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | (JOINTLY ADMINISTERED) |
| NAMWEST, LLC, | ) | Case No. 2:08-13935-CGC |
| NAMWEST-101 BUILDING, LLC | ) | Case No. 2:08-13954-GBN |
| NAMWEST-GLENROSA & 35TH AVENUE, LLC, | ) | Case No. 2:08-13939-CGC |
| NAMWEST-BROWNSTONE, LLC, | ) | Case No. 2:08-14022-GBN |
| NAMWEST-DOBBINS, LLC, | ) | Case No. 2:08-14024-SSC |
| NAMWEST-SUN CITY MANOR, LLC, | ) | Case No. 2:08-14025-JMM |
| NAMWEST-TOWN LAKES II, LLC, | ) | Case No. 2:08-14027-SSC |
| NAMWEST-7TH STREET & DEER VALLEY, LLC, | ) | Case No. 2:08-14031-CGC |
| NAMWEST CONSTRUCTION & DEVELOPMENT, LLC, | ) | Case No. 2:08-14033-GBN |
| SWB ENTERPRISES, LLC, | ) | Case No. 2:08-13972-CGC |
| Debtors. | ) | ORDER RE: BOUCHERIAN SETTLEMENT |

**I. Facts**

Debtor NTL II has agreed with Roya Boucherian to settle a number of disputes by, among other things, selling its membership interest to Boucherian for $500,000, abandoning any claim that it has an option to purchase the so-called Club Rio property, and dismissing the NTL II bankruptcy case and related adversary proceedings. The Movants acknowledge that approval

of the settlement would effectively "close down" this case, providing only the $500,000 for payment of administrative expenses and nothing else for the holders of any other claims or interests. The Kohan parties have objected, claiming that the settlement is a "give-away" of valuable property that adversely affects their rights as alleged 27% equity holders in NTL II and NTL (a non-debtor). The Committee took new formal position but counsel agreed on the record that the Debtor's analysis appeared to be correct. Several unsecured creditors informally objected.

An initial hearing was held on December 10, 2009, at which time the matter was taken under advisement to consider the sole question whether the record was sufficient to support a finding that the settlement satisfied the applicable requirements under Ninth Circuit law or whether a further evidentiary hearing was necessary.

Voluminous declarations were filed on both sides of the issue. If approval or disapproval of the settlement depends on consideration of the contents of those declarations, then a further hearing would be necessary to give all sides the opportunity to probe their veracity and relevance through cross-examination.[1] At bottom, however, the Debtor contends that it is not necessary to do so because adequate evidentiary support is provided by two court-approved settlements, one in this case and another is the related Namco bankruptcy case pending in Los Angeles, both of which were approved over the active opposition of the Kohan parties. These are:

- The Beshmada settlement approved in this Court (by a now final order) that
  ○ established Namco's lien (which was collaterally assigned to Boucherian) on the NTL II property at $9.5 million,
  ○ in exchange for Boucherian's promise to extend DIP financing in the amount of $450,000,
  ○ and Beshmada's promise to "true up" the amount of the Namco advances,
  ○ together with Beshmada's agreement that its share of revenues from the Crowne Plaza in New Jersey would be paid to Debtor to make up any shortfall between $9.5 million and the "true up" amount.

---

[1] Kohan has filed a motion to reopen the record to which both the Debtor and Boucherian have objected. In light of this order, that motion is denied as moot.

2

- The Namco settlement approved in Los Angeles that, according to Movants,
  - recognizes the validity of Boucherian's loan of $16.5 million to Namco and
  - the validity of collateral assignment to Boucherian of Namco's liens in the amount of $9.5 million as partial security for that loan, and
  - allows for the foreclosure by the Namco trustee of its deed of trust on the NTL property,
  - provides that, following foreclosure, Boucherian agrees to buy the NTL property from the Namco Trustee for $2.2 million, and
  - provides that Boucherian will grant the Trustee the option until June 30, 2012 to purchase both the NTL and NTL II properties at a price calculated to make Boucherian "whole," presumably so that the Trustee could sell the property to a third party at a profit to the Namco estate.

As a result of these settlements, the movants argue that 1) only Boucherian is now in a position to control both parcels (NTL's Club Rio parcel and NTL II's Wilde parcel), regardless of the validity or invalidity of the alleged Club Rio option upon which Kohan depends; 2) even if the Club Rio option were valid (and there is no single signed document granting such an option), it will be wiped out by the Namco Trustee's foreclosure sale; 3) Kohan's alleged 27% interest is at best equity, also subject to being wiped out by the foreclosure; 4) Kohan's attacks on the validity of the Namco lien and the Boucherian loan are precluded by the approval of the two settlements over Kohan's opposition; and 5) Kohan's assertions that he has a 27% equity interest and the Club Rio option are irrelevant in light of the pending foreclosure by a senior creditor which, even if such interest and option existed, would eliminate them.

Kohan has filed an alternative plan of reorganization under which he proposes to exercise the Club Rio option, provide exit financing, recognize the Boucherian lien in a substantially reduced amount and pay administrative and unsecured creditors in exchange for a majority interest in the reorganized debtor. He argues that this is a preferable alternative to the proposed settlement. Approval of his disclosure statement is pending.

Kohan also attacks the sufficiency of the $500,000 to be paid by Boucherian to purchase the membership interest in NTL II. Movants counter that the only asset of NTL II is the

3

Wilde Property and it is subject to the $9.5 million lien of Boucherian. The McBride declaration states his opinion that the Wilde property, by itself, is worth around $5 million. There is no declaration evidence from objectors to the contrary and there is no appraisal evidence in the record.[2] All parties agree that the value of each parcel is substantially less by itself than would be the case if the two were combined in a single parcel.

## II. Analysis

The Debtors seek an order under Bankruptcy Rule 9019 approving the terms of Settlement Agreement. The standards for approval are well established. The Ninth Circuit Court of Appeals has long recognized that "[t]he bankruptcy court has great latitude in approving compromise agreements." *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988); *see also In re Daley's Dump Truck Svcs, Inc.*, 108 F.3d. 213, 215 (9th Cir. 1997). The purpose of such a compromise is to allow a debtor in possession "to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *Martin v. Kane (In re A & C Properties),* 784 F.2d 1377, 1380-81 (9th Cir.) (internal quotations omitted), *cert. denied*, 479 U.S. 854 (1986). In approving a settlement agreement, the Court need not conduct either an exhaustive investigation into the validity, or a mini-trial on the merits, of the claims sought to be compromised. *United States v. Alaska National Bank (In re Walsh Constr., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982). Rather, it is sufficient that the Court find that the settlement was negotiated in good faith and is reasonable, fair, and equitable. *In re A & C Properties,* 784 F.2d at 1381.

The Ninth Circuit has identified the following factors for consideration in determining whether a proposed settlement agreement is reasonable, fair, and equitable:

    (a) the probability of success in the litigation;

    (b) the difficulties, if any, to be encountered in the matter of collection;

---

[2] Debtor's counsel asserted that Kohan stated a value of $6.5 million in his declaration but the Court's review revealed no such statement.

4

(c) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

(d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

Consideration of these factors does not require the Court to decide the questions of law and fact raised in the controversies sought to be settled, or to determine whether the settlement presented is the best one that could possibly have been achieved. Rather, the Court need only canvass the issues to determine whether the settlement falls "below the lowest point in the zone of reasonableness." *Goodwin v. Mickey Thompson Ent. Group*, 292 B.R. 415, 420 (9th Cir. B.A.P. 2003). Finally, although the Court should give deference to the reasonable views of creditors, objections are not determinative. It is well established that compromises are favored in bankruptcy. *In re Lee Way Holding Co.*, 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990).

Notwithstanding the bias in favor of compromises, the proponent has the burden of proving the facts necessary to meet the so-called *Woodson* factors to enable the Court to make the findings of fact and conclusions of law required under Fed. R. Bank. Proc. 7052 and 9014(c).

The Court has carefully reviewed all of the materials submitted and the arguments of counsel made at the hearing. Given the net effect of this settlement (i.e., that it "throws in the towel" with no recovery for any constituent other than some of the administrative expenses) and the lack of any testimony that has been subjected to cross-examination, the Court is of the view that a more complete record is necessary in order for it to determine if the *Woodson* factors have in fact been met. Therefore, a further hearing will be scheduled as soon as practicable. The issues to be considered are listed below. It is unlikely that this hearing will be completed prior to the scheduled trustee's sale on the NTL property scheduled for early January. If the Namco Trustee is unwilling to continue the sale voluntarily until the further hearing on this matter is completed and an order entered, then the court will schedule a hearing on Kohan's application for a temporary restraining order in Adversary Proceeding 08-860 prior to the sale date. The parties are advised

5

that, in such event, it is the Court's present intention to enter a TRO at that time to allow resolution of this matter.

The Court does not intend to hear testimony or have evidence introduced on the dual issues of whether Kohan is or ought to be a 27% member in NTL and/or NTL II and whether a "Club Rio Option" exists. Each party's position on these matters has been made perfectly clear and, likewise, it is evident that these issues are subject to hotly contested facts relating to promises allegedly made, confirmations allegedly given, reliance allegedly undertaken and so on. It is likewise clear that Kohan's claims are based not on formal executed documents conferring membership status or creating the option but rather on representations, emails, drafts, promises, and so on. In determining whether to approve the settlement, the Court will take into account the undetermined and hotly contested nature of these claims.

On the other hand, the Court will require evidence of the following:

1. Have the triggers in the Beshmada Agreement occurred and if not, what is the impact on the reasonableness of this settlement? Is there a credible basis upon which to challenge all or any part of the Boucherian debt of $9.5 million.

2. What are the precise terms of the Namco settlement, what is its current status and what impact does it have on this settlement?

3. Is the $500,000 purchase price fair and reasonable? Is it fair and reasonable to sell the membership interest to Boucherian without the opportunity for competing bids? Is the exclusive sale to Boucherian justified as part of a settlement under applicable Ninth Circuit law? Is it reasonable to conclude that Boucherian's would be a good faith purchaser? What is the DIP's view of the value of the Wilde property on a stand alone basis and what is the basis of that view? Does the Debtor LLC have any other assets with any available equity for the estate?

4. What is the impact of Boucherian's claim that she is a holder in due course? What is the probability of success on the merits of litigating that issue? What are the costs?

5. What process did the Debtor in Possession pursue to reach the conclusion that this settlement is in the best interests of the estate? What alternatives were considered? What attempts, if any, were undertaken to arrive at a result that would yield a return to a constituency other than the holders of administrative expense claims?

The parties are to consult in good faith concerning scheduling and the time needed for the hearing. Based on all of the information exchanged to date, the Court is of the view that little or no discovery is needed or appropriate prior to the hearing. The parties are reminded, and admonished, that the purpose of the hearing is to determine if the proposed settlement meets the *Woodson* standards and that the hearing is not intended as a mini-trial of the contested factual issues.

The Court will consider all pre-hearing issues and issue a scheduling order at the Namwest hearing now set for 10:00 a.m. on January 5, 2010. Interested parties are advised to attend in person or telephonically.

Debtor is obligated to insure that all relevant parties receive notice of this order and the hearing on January 5, 2010.

SO ORDERED.

Dated: December 30, 2009

Charles G. Case II
United States Bankruptcy Judge

7